The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Catherine E. Zienoff presiding. Good morning everyone. This is case number 4-25-0121, Pepsico Inc. v. Illinois Department of Revenue, David Harris and Michael Frerichs in his capacity as treasurer. Would counsel identify themselves for the record, please? Counsel for the appellant first. Catherine Batten on behalf of Pepsico Inc. and affiliates. Counsel for appellee. Good morning, Your Honor. Leigh Jonig on behalf of the appellees. Thank you. Counsel for the appellant, you may begin your argument. I will mention that on Tuesdays at this time, there usually is a siren that goes off in many communities around the state. It's going off in mine. I don't know if you can hear it. I don't know. Just let me wait a minute. I don't want to miss anything here. So I think it's fine here. Do you hear it? Is it interrupting you for any reason? Any one of you who's on our screen? I am not hearing it, Your Honor, but happy to wait a minute to just let it pass for you if that's best. It just finished here, Your Honor. Oh, okay. Okay. Let's wait one more minute. All right. So it's somewhat distracting. It's not terribly loud. But again, if you don't mind, it's louder now. So let's just wait another minute or so. Thank you. Okay, I think it's finished. Thank you. Ms. Batten, you may begin your argument. Good morning, Your Honors. May it please the Court. The single most important significant issue presented by the decision below is the determination of whether PepsiCo Global Mobility or PGM is the common law employer of the U.S. expatriates who are temporarily assigned to PepsiCo's international entities around the world. It's important because it will impact all multinational companies with similar expatriate employees and will have carryover impact on other industries like employee leasing and staffing companies. But before we discuss that issue, I would like to briefly address two threshold issues that impacted the trial court's erroneous holding. First, PGM's substance. And second, the trial court's admission and reliance on a tax lawyer who testified as to legal conclusions. It's well established that taxpayers may structure their affairs to minimize taxes. Over and over again, courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. In fact, excuse me for interrupting. With respect to the subject of substance and whether there was substance to PGM, I do have a question and I'm glad you started with this topic. At page 10 of your opening brief, you indicate that there were no state tax motivations for the formation of this new GEO PGM to handle the expatriate program that was recommended by PwC. Instead, there were business motivations to replace BFSF, which was managing the export sales for U.S. military, consolidation of three entities, mitigation of permanent establishment risk, and protection of other PEPSICO entities from direct legal liability. But my question is, those motivations alone would not stop and did not stop the trial court and would not stop this court. Indeed, we'd have the responsibility, would we not, of looking at how PGM actually functioned. That's correct. The courts look at two things. They first look to see if there were any business reasons for the formation of the entity because if there weren't, if you formed it solely to save state taxes, then there would be a finding of lack of economic substance. That's not the facts of this case. But then you would look, you're right, Your Honor, you would look at how the entity functioned, whether it had real employees performing real functions. That's what we did have here. We had over 100 expatriates performing functions. For foreign host companies and... Well, they didn't sign any contracts. They really had no power with respect to PGM, nor were there any supervisors that PGM had supervising the expats. It was the foreign, and I know I'm getting into this other issue of employer and employee, but it was the foreign host company that supervised. But going back to how PGM actually functioned, there was another entity, human resources from another entity in PepsiCo handled the human resources. I mean, why wasn't PGM just a shell or a conduit here? Well, for a number of reasons. First, PGM had officers of the company that were acting on PGM's behalf. They selected the expatriates, they executed documents, they'd entered into contracts. So they did have functioning officers of PGM. You're correct that there was something called the global mobility function, which they dealt with the day-to-day and that was a centralized within PepsiCo centralized HR function. The whole PepsiCo enterprise uses a centralized HR function and it wouldn't have made sense to replicate that function within PGM because each area... There's an individual area of expertise, for example, immigration or housing, those types of things. And we have individuals with those specific areas of expertise that they only spent 20% to 30% of their time on PGM's expatriates. The other times they were working for other entities within the enterprise. So I don't think that negates PGM's substance to use centralized functions. It didn't operate for profit in any way, shape or form, did it? Nothing it did generated profit. It did not have a profit during these years. It did not have a profit. And that, I think, is a separate issue relating to transfer pricing, but I don't look at the case law relating to economic substance and shell companies or conduit companies. The facts are so different from what you see here, where you have real officers, real contracts entered into, real filings in other jurisdictions. It's vastly different than the case law. That really... Justice Leonard, you were going to ask a question on that. Go ahead. A follow-up quickly. Did it own property or have any bank accounts during this time period? It had... I think it had... I'm not sure about the... There wasn't property, but I'm not sure about the bank accounts. I don't think that is in the record. There were certainly... Yeah, I just don't know about that. I think there were certainly payments made from PGM, so I would assume an underlying account. And there was no markup, correct, for the cost of the expenses associated during this time period? Yes, that's correct. During this time period, there was no markup. And that certainly was something of concern of PepsiCo in terms of a markup. But that's a really... That's what's called transfer pricing, which is a federal tax issue. And if the issue is a lack of markup, there's an actual cure for that within the Illinois statutes. If you think that they should have marked up the services or the amount that they charge the foreign entities, then the real remedy for that is to employ... The IRC code is but in Illinois, there's a special provision. It's cited in our briefs. It's 35 ILCS 5-404. It's reallocating income. And the reason the department didn't use that here is it would just have been a miniscule... In my opinion, it would have just been a miniscule adjustment to have included the amount that they should have charged for markup. It wouldn't have changed materially the amount due. Thank you. But counsel, aren't there other factors really necessary for US-based entities that nominally employ foreign workers to be regarded as more than a shell? I mean, charging reasonable service fees for the expat work and being reimbursed, again, at a markup, having persons employed to operate the company, there was no one operating PGM. The payroll was actually done by a payroll service. Again, while they were officers, they really couldn't do much that was significant in any way with respect to PGM. It just, again, it didn't operate for a profit. I mean, how was this different than a conduit? Well, I think it absolutely did have folks running the entity. PGM had, like I said, I'd had officers and they did have meaningful roles. They made all the hiring and firing decisions, reassignments. There's evidence of that. I think the record shows that really the foreign companies were the ones who had the ability to discharge and terminate an employee from that position with them. They had the right to control that, to control the work, and they had the right to discharge as well. Okay. It's very important we clear that up, that is simply incorrect. The only entity that had the right to discharge these expatriates was PGM. The only rights that the host companies had was the right to terminate the assignment. In one scenario, if you terminate the assignment, the expatriate goes back to PGM and is reassigned to another entity. In the simplest terms, the employee still has a job when you terminate the assignment, but the only entity that could terminate the expatriate was PGM. That would result in the loss of job. That is the right to discharge that we see in the case law. There's ample evidence in the record. There were three different terminations that occurred during this period in the record that were executed by PGM officers. I know we've got a lot to cover, so I apologize for some of the interruptions here. Wasn't it really PepsiCo's human resource department that had the right to discharge, not PGM? It was the human resources department. That they would for any of the other PepsiCo entities. They have a centralized HR department. Any of the entities within the PepsiCo group, PGM was treated no differently than any of the other entities in the PepsiCo family. They all use the centralized HR department to do human resources functions. Did they pay for those services? They did not. Does PGM pay for the services? They did not. They did not pay for those services. And there's a stipulated fact in the record that the other entities in the group did not pay as well. So it wasn't any different. Can I go back to a statement you made earlier on? You said that PGM didn't operate on a profit during the relevant years. Did they ever operate on a profit prior to litigation? I don't know the answer to that, Your Honor. I'm just not sure what it was. Were they even set up to obtain a profit? I think that the policy at PepsiCo, which wasn't followed here, admittedly, there was an error. I think we had our director of taxes explain that an error was made here. There should have been a markup charge, certainly, which would have generated a profit. Well, but there's a difference between just not making a profit and not even being set up to obtain a profit. And my question is, was PGM even set up to make a profit at all? It would have been, Your Honor, if they followed that transfer pricing policy, it would have made a profit because it would have gotten its cost plus a markup. So what's missing here is that markup, admittedly. And PepsiCo was very candid about that and suggested that the cure to its failure to charge that markup was to make adjustments to the transfer pricing. And what would that mean? Go ahead, answer. Oh, sorry. That would mean that they would have more money. They would have the entity that was charging for the expatriates, PGM, the foreign host companies, they would have gotten a markup. Let's say it was 10%. So there would have been a 10% margin that they would have kept that would have been included in the income. Okay. My last question is, in the agreements between PGM and the foreign host companies, were the expats authorized to conduct any business in the name of PGM? They couldn't conduct business per se in the name of PGM. And that's where it's important to understand how global employment organizations operate. The whole purpose of them is to have a U.S. employing entity to protect against foreign governments from saying, well, this U.S. entity is operating within the jurisdictions of our borders. And that's why that's always how global employment organizations operate. I don't think that's any indicator of a lack of substance. I think that that's all about sort of looking at the entity of PGM in the context of global employment organizations and how they and how they generally operate. I think that's how the best measure of the substance of an entity is really to look at how entities doing the same thing operate. And that's why we had the expert on geos to explain that to the trier effect. Thank you. I had, since our time is moving quickly, to try to move us into a different topic, which I believe you were going to cover. You argue in your reply brief that the first district PepsiCo decision was wrong. And there was a very lengthy analysis of whether PGM was in reality the employer of the expats. If you can indicate succinctly why you believe they were wrong and why that case is different than our situation in this case for the years 2016 and 17. Yes, your honor. Two things, just in terms of difference of opinion or different differences, there's factual differences. So as a threshold manner, these are later years where the earlier years where PGM was in its infancy, we didn't have the, I think, key indicia of control being the right to reassign the right to fire, which we have in the record here, multiple instances of that. But more importantly, which I think I really want to highlight is the legal error that was made by the first district. First, the court declined to determine who was the employer of the expatriates if it wasn't PGM. Second, it applied a body of law addressing an entity that's a different legal issue, whether the worker's actually employee instead of an independent contractor. And third, it inexplicably ignored inallegate cases, analyzing that scenario that we have here, which is which of two possible entities is the employer of workers in the context of arrangements involving temporary foreign work assignments and employee leasing and temporary staffing. And those legal errors, I think we discussed them at length in our brief, really led to the erroneous conclusion by the court. And I am concerned that if this court follows it, it really represents the end of expatriate programs using global employment organizations because that's how they operate. They cede the control over. Let's look at the specifics here then for a minute and what the trial court found, the factual findings and concluded. But we started to talk about the indicia of employee-employer relationships. And one thing in the record that struck me, and I wanted to find out what your take was on this contract language, the secondment agreements did state that the expats, as Justice Leonard mentioned, had no authority to conduct any business in the name of PGM. How is that contract language consistent with your position that PGM truly was the employer of these expats? That, as I had tried to explain earlier, that language is used so that no one is conducting business for PGM in a foreign land, so that foreign jurisdictions can't go after that entity. So they're not, they aren't, in fact, operating on PGM's behalf in the foreign jurisdictions. I think that's a different question as to, if we look at the factors that courts look at to determine whether someone is a common law employer, they're looking at the right to control, the right to discharge, and the other two, which are so obvious here, which is just that they were on a temporary assignment and that the parties intended PGM. Now, I think if you look at right to control, the critical fact there is really the fact that PGM had the right to take that expatriate from the foreign host company at any time and reassign them to another entity. But that's an assignment. That's not the right to control the work that they did. That's different. But they had the absolute right to do so. And the regulations and the case laws say that you don't have to exercise that day-to-day control. You just have the right to do so. And they had to follow PGM's policies. This is a bit nuanced. There were no supervisory personnel associated with PGM to actually execute that function. It was human resources, was it not, in a different part of PepsiCo that actually executed that function. So, I don't see how it's associated. Go ahead. Sorry. It was the PGM officers. So, in connection with the HR department, but it was the PGM officers that executed and made the decisions regarding the reassignments and the terminations. And that was clear in the record. There was testimony from the officers and there's records that show that officers executed all the agreements with the terminations and the reassignments. Which officer was that? Or did it require the board meeting? Which specific officer had the authority to terminate? There wasn't a specific officer. It could have been any of them. In the record, I think we had a number of different officers, examples during this time period. Now, to be clear, the right to terminate were high-level executives, so it didn't happen often. But I believe we had three different instances in the record, and it may have been three different corporate officers that were involved in those, because there were different officers for different regions and had different areas of expertise. So, it wasn't a specific officer who was in charge of that. Thank you. I'm sorry your time is up. I know there's a lot of material to cover. You do have time on rebuttal, and hopefully we'll get to the third issue. Thank you very much, counsel. All right. Ms. Janik. Thank you, Your Honor, and may it please the Court. I'm Assistant Attorney General Leigh Janik on behalf of the appellees. The Circuit Court held a bench trial here to answer two fact-specific questions based on the evidence. First, if the expatriates were employees of PGM, and second, if PGM was a shell company whose activities lacked economic substance. Finding for the Department on either of these questions would mean that PepsiCo did not meet its burden to show, by clear and convincing evidence, that Frito-Lay North America was properly excluded from its tax return. The Circuit Court found for the Department on both of these questions based on its evaluation of the evidence, and it also found for the Department on the third question in this case determined that the evidence showed that PepsiCo did not exercise ordinary business care and therefore was not entitled to abatement of penalties. PepsiCo argues that all three of these decisions were wrong, but its arguments simply ask the Court to reweigh the evidence, which is not a basis to reverse after a bench trial. Unless the Court prefers otherwise, I'll start with that first question that the expatriates were not employees of PGM. If the Court affirms on this basis, it does not need to reach the substance over form question. Well, let's just stop right there with respect to terminology because we've used, there's the term substance over form and economic substance doctrine. The Rogers case, the federal I think does a good job in actually defining the difference between the two of them. And previously with counsel, I was referring to the economic substance doctrine and my understanding is that it is different, although somewhat nuanced, from the substance over form document. The economic substance doctrine as explained by Rogers, and I'm not quoting, I'm paraphrasing, typically applies where a taxing authority argues that a transaction contained no substance and was motivated only by the desire to obtain an unwarranted tax benefit. Whereas the substance over form doctrine, which is what you refer to when you use in your brief, by contrast, typically applies where there's a question about whether a transaction should be recharacterized to comport with its true substance. So while I read your brief to actually mean PGM lacked economic substance as an entity and a participant in labor transactions, not that its role in the transactions had substance but should be recharacterized. Can you clarify this for us, please? I think that's right, Your Honor. The Illinois courts have not quite used that exact nuance in the different terminology. But here, because we're talking about the operations of an entity as opposed to a single transaction, I think the economic substance terminology would be more appropriate. But the same principles really underpin both doctrines to the extent they're different. And so, you know, Illinois courts often use the substance over form terminology kind of more expressly. But I think, you know, it really depends more on the context as opposed to kind of the difference in sort of the underlying doctrine. But so if I may, to actually start with the question of the employee relationship, because this is actually a test that's laid out in statute. There's an Illinois law that refers specifically to a federal regulation that says here are the factors to assess whether an employment relationship exists. Counsel, how do you respond to opposing counsel's argument that actually PGM had the right to employ, had the right to control the work, had the right to discharge? These are all indicia of an employer. Will you respond to the specifics that she mentioned, please? Yes, I'll go through, you know, just to address the question of, you know, the reassignment and then the PGM officers is what PepsiCo points to. But before getting into that specifics, Your Honor, just at a high level, you know, to be clear, this is being reviewed, you know, this is reviewing the verdict after a bench trial. So this is being examined for the manifest weight of the evidence. So even if, you know, there's other evidence that PepsiCo can point to that would support, you know, its view of the evidence, that's not what's being reviewed on appeal. The question here is whether there is evidence to support the verdict. And I will, you know, get into why there is, but just to address those two specific pieces of evidence. First, this question of the PGM officers being involved in these decisions, you know, we lay out on pages 23 and 25 and 27 of our brief evidence that shows that these were decisions that were made kind of by PepsiCo senior management at a high level about hiring and firing and, you know, high level compensation decisions. And then officers would come at, you know, would be some of the senior management represented there, but they were not the people solely making the decisions. And, you know, they would come in and we needed to, you know, sign the official documents because they were the ones with signatory authority, but they're not the, you know, we, you know, point to evidence on those pages of our brief that shows that it was PepsiCo senior management that were the ones making these decisions. As opposed to PGM, is that what you're saying? As opposed to PGM officers kind of, you know, you know, on its, as opposed to PGM on its own yes. And then with respect to the reassignment and, you know, again, we point to evidence in the record that it was PepsiCo senior management making these assignment decisions, but even, you know, accepting PepsiCo's characterization that it was officers making, you know, these decisions on their own, what the regulation that is expressly incorporated into Illinois law says is that when you're talking about the right to control, it's not just control at a high level, it's control of what shall be done and how it shall be done. So it's not just, you know, we can decide to reassign you or not. It's decide, you know, it's having control over what your work activities are on a day-to-day or week-to-week basis. That's what the right to control means. And that's what PGM did not have. There's evidence in the record that shows that it was the foreign host companies that controlled, you know, their day-to-day work activities that they're the ones that effectively for the cost of their compensation, the foreign host companies determined their performance rating and annual reviews. And then it was PepsiCo, you know, sort of corporate senior management that would make these high level decisions about assignments and compensation. And so, you know, sort of either way you look at it, there's not evidence that PGM was the one that was making these decisions. And so, and that evidence in the record certainly supports the circuit court's verdict and shows that it was not against the manifest weight of the evidence here. You know, and to the circuit court, excuse me, the first district. Let me just stop there for a minute. So you're making a distinction between the right, the and you're saying because the foreign companies had the right to control the day-to-day work, that's what mattered? I would say that opposing council was talking about PepsiCo's, I guess, PGM, PGM's right to control the work because they had the right to discharge as well. Right. So I guess, to be clear, Your Honor, what the regulation, you know, that's at issue here that sets forth the right to control says that you have to look at control in both of these senses. And our point is either way, you know, if you look at it on sort of looking at, you know, who controlled Pepsi, you know, excuse me, the expatriates kind of day-to-day work, or if you look at the high control of making assignment and compensation decisions, either way, it wasn't PGM making these decisions. There's evidence in the record that supports that. And so, you know, the verdict was not against the manifest way that the evidence. With respect to the first district decision, I want to address PepsiCo's sort of arguments to distinguish it. First, with respect to this argument that the facts are different, they're not. Just looking at the analysis section of the first district's decision, it's referring to the same facts that, you know, that are effectively present here. Surely there are some differences because these are different tax years. We acknowledge that. But overall, the relationship between the expatriates, PGM, the foreign host companies and PepsiCo was all the same. You know, with respect to this argument that the first district applied the wrong factors, again, that's not correct. Just looking at the analysis of the first district and comparing it, in fact, to PepsiCo's, page 26 of PepsiCo's opening brief, PepsiCo sets forth, here are the factors that should be considered, and they're the same factors the first district analyzed. You know, PepsiCo, I'm sure, wishes the first district decision came out differently, but that doesn't mean it's legally wrong. And the fact that, you know, that the first district may have, excuse me, analogized to independent contractor cases, which also evaluate whether an employment relationship exists, and also assess whether there is, you know, the right to control, that is, you know, just not a legal error. And, you know, the first district's analysis of that evidence, you know, it's the same evidence here, and going through the same factors, you know, the right to control, you know, that analysis is the same here. So there's no reason for the court to, you know, distinguish that case on either of these bases. You know, I do want to address also this argument that the first district didn't say who the employer was of the expatriates, and again, this court does not need to decide that here. This case is solely about whether PGM was the employer of the expatriates, yes or no. Who was the employer might be a more difficult question, and it might need the development of additional facts about the foreign host companies and PepsiCo. But those facts were not needed here, because this case is only about whether PGM is the employer. You know, unless the court has any further questions on this employment issue, I will move on to the economic substance issue. But I just want to clarify that, you know, this is, you know, just reviewing the circuit court's, you know, evaluation of the evidence that was presented to it, and whether that was supported by the evidence. It was. The court does not, you know, reweigh that evidence anew on appeal, and so the court can just affirm on that basis alone. But even if the court were to address this economic substance issue, you know, there's also evidence in the record that PGM did not have real economic substance. It functioned effectively as a conduit for the foreign host companies to pay the compensation to the expatriates. You know, I do want to briefly address this argument that, you know, this- Well, let me just interrupt here. I know time is a wasting, and again, I apologize for the interruption, but counsel argued, I believe, and we talked about some business reasons that motivated PepsiCo, with professional advice, to create PGM. And why isn't that- Why aren't those reasons important, and why shouldn't we just focus on those reasons, those business reasons, as the motivation? So- To determine this issue of economic substance. So, a couple of responses to that, Your Honor. First, the, you know, there was, you know, PepsiCo put forth evidence about these business reasons, but there was also evidence, you know, as I said, of, you know, PGM just effectively acting as a conduit. And the circuit court, you know, is in the position to weigh all of this evidence and decide what evidence it's going to credit. And so, here, it clearly decided to credit not this evidence of these business purposes. And that makes sense here, Your Honor, because the evidence that PepsiCo put forth was mostly about, you know, this term, GEOs generally, that GEOs have this, you know, great purpose for companies generally. But that doesn't really answer the question about whether PGM, in this case, based on this evidence, actually achieved those benefits. And there was evidence here that it did not. You know, PepsiCo's own expert, and, you know, one of the sources that it cites in its brief, say that, well, you know, if you want to be using this kind of GEO for it to be respected by taxing authorities, you should be charging a that that's kind of best practices. And PepsiCo didn't do that here. So, I think, you know, faced with that evidence, the circuit court was certainly reasonable to, you know, look at the evidence as a whole and assess that PGM was acting as a conduit here. You know, with respect to... What's your response to, excuse me, what is your response to opposing counsel's argument that really the department should have reallocated the income between the PepsiCo affiliates during audits to account for the markups? Excuse me, Your Honor. I did want to clarify that because that statute just doesn't apply here. You know, that is about reallocating income that wasn't properly allocated to Illinois. But this case is not about allocating income. This case is about PepsiCo excluded an entity entirely from its tax return. So, it's a totally different issue here. And so, I just, you know, I'm not frankly really sure why they're suggesting that it should be reallocated. The the way that PepsiCo, you know, did this was incorrect and issued a notice of deficiency, and that's how this process normally works. It's not reallocating income here. And, you know, we have not suggested that we did. I think PepsiCo kind of suggested in its opening brief that we should have, and then later in its reply suggested that we didn't, and we maintain that we didn't. But, you know, going back to this, I think one of the things that I understand PepsiCo to be arguing on this point is that, you know, this argument about a markup and being a conduit is really a transfer pricing issue, and that's not what this case is. And it's true, this is not a transfer pricing case, and that is a concept in federal tax law. But the underlying principle that's underlying the concept of transfer pricing in federal tax law is that when related entities do business with each other, those transactions are not arm's length. So, there's a markup to kind of reflect that there needs to be substance to the transaction. Otherwise, you're just related entities moving money around on paper. And that's the same principle that's, you know, presented here, that PepsiCo, by not charging a markup when its related entities were transacting with each other, is, you know, essentially just moving money around on paper, and, you know, PGM is acting as a conduit, you know, between the foreign host companies and the expatriates. So, I did just want to clarify that. You know, and then, you know, before I move on to the last issue very briefly, I do just want to address this argument that, you know, this is going to be very detrimental to, you know, multinational companies that want to use these kind of expatriates program. And to clarify that the circuit court's verdict here is not that, you know, companies can never do this, can never use U.S. entities to employ expatriates. What this case is about is whether this entity, under these facts, employed these expatriates. And it did not. The evidence supports that. This kind of argument about these broader consequences isn't before the court. Just to, you know, I'm happy to entertain any questions about the expert testimony. Otherwise, we'll stand on our brief on that point. Because, you know, even if, you know, any of this evidence was legal conclusions, as we explained in our brief, that admission would be harmless. I mean, we disagree that they are legal conclusions, and we'll stand on our brief on that point. But, you know, the first district reached the same outcome without the expert testimony. And all of the evidence that we've been talking about here today is not, you know, hasn't been about the expert testimony. So there's plenty of evidence that supports the verdict. So the court, you know, doesn't even need to reach the issue of admissibility of the expert. Because, you know, there's plenty of other evidence to support the verdict here. And then, finally, with respect to the penalties abatement, I just, you know, that evidence, excuse me, that decision was also supported by the record. The PepsiCo put forth. This company, excuse me for interrupting. I do have a question. This company did file their Illinois tax returns on time. They generally did have a good history of tax compliance. I mean, how should that affect our analysis of whether they had reasonable cause for excluding FLNA from their unitary business group on their 2016 and 2017 taxes? Well, it shouldn't affect this court's analysis, Your Honor, because, again, this court is also reviewing that decision for the evidence. Well, exactly. I misspoke. But then the trial court and how we look at the trial court. I mean, isn't that something that the trial court should have looked at and given weight to? I mean, it's, you know, there's no evidence that the trial court didn't look at it. Again, the trial court is considering all of the evidence that's, you know, presented to it. And that included the evidence of compliance history, which we don't dispute. But it also included this evidence from, you know, a member of PepsiCo's tax department that, you know, he effectively conducted very little analysis before making this decision that PepsiCo knew was going to have significant impact on its state and local taxes. And so just with knowing this kind of substantial impact that that decision was going to have for a sophisticated taxpayer, you know, the circuit court reasonably concluded that you'd expect some more analysis to qualify as ordinary business care. Thank you. All right. Your time is up. Thank you very much, Ms. Johnick. Ms. Batten, your reply. Thank you, Your Honor. There's a lot to unpack there, but I'm going to try to limit it to four or five key things. First, the department urges that you should give the trial court's decision a cursory review, mentioned a number of times, manifest weight of evidence standard, which is really only applicable to findings of fact. Here, the trial court gave us little insight into its reasoning, and it made very few factual findings, didn't provide any legal support for its holdings. That in and of itself ought to give you pause. As the trial court is the trier of fact, the circuit court was required to determine the facts based on the evidence presented, and then apply the relevant law thereto. And it failed to do so here. So I would urge this court to take a deeper dive into the record. Second, the counsel for the department states that you don't really need to decide who was the employer. I couldn't disagree more. All of the there's a determination about who is the legal employer. And I feel that's important. When you talk about weighing factors, of course, you're going to have some things where, oh, this entity didn't do this, and this entity didn't do that. That's not enough to exclude it, particularly when there's no one else who can serve as the employer. I mean, there's only one. If you weigh the factors, the four factors here, there's only one entity that could be the common law employer, and that's that's PGM. So it's absolutely essential in thinking about the factors and weighing them to consider who, if not PGM, was the common law employer. Third, Don't you only have to find the PGM isn't the employer? Not the court's job to determine who is. The question is, is PGM? If PGM isn't the employer, doesn't that answer the question? That it certainly does answer the question that it's not it's not the employer. But I think if you're weighing the factors, you have to ask yourself, who would be the employer? I mean, if we look at PGM, I mean, they didn't have true. They did not have the they ceded the day to day authority over the expatriates to the foreign host country. That's it. And in the cases say over and over and over again, that's OK. That doesn't make them not the employer. So I just I do think you have to think about who else could possibly be an employer before you make a finding that it's not PGM, because in this instance, there's only one entity that had the right to terminate the expatriates. And that was PGM. There's only one entity that could do the reassignments. And that was PGM. You know, they were temporary assignments. And this is how temporary assignments work. If you have temporary leasing companies, temporary staffing companies, sure, the host company looks after the employee on a day to day basis and directs their affairs. It doesn't mean they're the employing the employer of the entity. This entity provided the the expatriates with the benefits. If not for being an employee of PGM, these expatriates would not have had these critical benefits, you know, and be able to stay in the U.S. pension plan. So it's absolutely critical to think about who else could have been the employer. And the counsel for the department also says that the first district case is the same here. You don't have to think further. They already looked at this. And that's absolutely not true. It's factually different in terms of key points, the right to discharge. It was clear. We have clear evidence in the record that PGM officers terminated expatriates during this time period. And they also made reassignments, which is key to showing that the entity had the right to control the expatriates. And I guess on a point, I'll let you make your last point, but I just wanted to indicate with respect to the case law, our situation really is different. I mean, we have three internal entities that we're looking at, PepsiCo, FLNA, and PGA. The cases really talked about unrelated entities in determining who was an employer, whether in one, you know, it was NATO versus the U.S. Army. And so I don't know how useful these cases really are. But anyway, we certainly will read and consider the cases, but I think that's something important to be noted. But go ahead and make your other point, Counsel. I do think they're instructive, though, in terms of temporary assignments. I think the fact that they're related parties at the end of the common law employer issue, it doesn't matter. But my last point goes to really the transfer pricing, because I heard the department's counsel say two different things. One, that really does imply two, we're concerned with transfer pricing between the parties. And absolutely, the concern here is that they didn't charge a markup to the foreign host companies for the expatriates, and they didn't pay the folks that did nominal duties in their HR department. The answer to that is not to act as if PGM didn't exist. The answer to that is to use a 482 equivalent. That's what they do in federal tax law. And we have that. The Illinois legislature gave the department the authority to do that under Section 35 ILCS 5404. So absolutely, you can make those adjustments. And that's what the department should have used here if they were about inadequate transfer pricing with this arrangement of having forced the temporary assignments to foreign host companies. Thank you. Your time is up. And we've gone over a little bit, but obviously, there was reason to do that. Justice Dierman, do you have any further questions? Thank you. Justice Lanard? No, thank you. Counsel, thank you both for your excellent arguments this morning. The court will take the matter under advisement and render a decision in due course. Court is adjourned at this time. Thank you.